Good morning. May it please the court. I want to echo what you said, Judge Egerson. We're happy to be back in person also. I'm Alfredo Parrish. I represent Mr. Kendall Streb. I'm honored to represent him. He's a 54-year-old electrician from Hills, Iowa, who was wrongfully convicted of eight counts, which we have with the court, and I won't repeat those. There is no doubt in this case that Mr. Streb went out looking for sex. He went on the Internet doing that. Also, it's without doubt that he interacted with these young ladies, and that's not in dispute. His defense was built around the ability to show that these young ladies used drugs, they lacked credibility, they were confused about what they were doing by their own admission, and that they had advertised themselves to be older than what they actually were. As you know, this trial was somewhat contentious all the way through, and I want to focus on two issues, and if you don't mind, I'd like to argue from the fourth issue back to the trial errors, then back to the issue which I think is definitive and unusual for this court to have to deal with. The 924C is the one that adds the 60 months because it is a mandatory consecutive sentence that has to be imposed. When the district court judge imposed the 208 months, she had to impose another 60 months on top of it. The judge herself, a career prosecutor, and also former United States Attorney for the Northern District of Iowa, said it was the weakest 924 case she had ever seen. In that case, the weapons, and you can look at the photographs, the lower shaft that they talk about where these weapons were found, one was in a holster, one was a little bit higher up, a shelf was higher up than that, but it was not a low shaft where it was in reach. And the drugs that were found in the bedroom were, in fact, what you can consider minuscule. Now, the total amount of drugs were 4.5. Nobody is disputing that. But within the bedroom where the nightstand was where Mr. Streb would sleep and his wife would sleep, a minuscule amount of marijuana and a minuscule amount of methamphetamine residue. There was a scale found and a razor blade. But, as you know, users, which he admitted during the interview with the officers, he was a user and had been off and on. And you can see from his prior conviction in about 2010, 2012, he also was a user. But not a single one of the individuals who interacted with him ever saw him with a firearm. He never displayed it in a threatening manner. He never carried it. There were no drug notes found in any spot that the officers searched. No drug notes on his telephone. Not one witness came into the courtroom who said he had sold drugs to them at the same time he had a firearm. So the 922G would be more applicable than the 924C. And I think the judge's acknowledgment toward the end of the sentencing where she said, this is not what 924 was created for. His conduct was not consistent with the law. Mr. Streb did not carry a weapon in furtherance of any drug transactions. Now, what do you do, though? We've got all these cases that say when the drugs are found in close proximity to the firearm that that is good enough. What do we do with those? Well, I looked at the Roy case, which I think you have to look at the facts. I think you go into his bedroom as appellate judges, look at where the weapons were, not the top shelf but next to the top shelf where there's a clothing closet. You look that he was a user. You look at where each his wife had the marijuana and he had the methamphetamine. And we can see that there were bullets in his truck. But that doesn't mean that he carried a weapon in relation to a drug transaction. So I believe you have to, Judge Strauss, look at the actual facts. And that's how the Eighth Circuit, if you look at the trend of cases there, follow it. And I think that's what the district court judge was talking about also. Let's follow the trend of how you look at how do you carry a firearm in furtherance of a drug transaction. In this case, there is not sufficient evidence that a reasonable jury could have found that he was guilty of the 924C. I next would like to deal with the three issues that I believe would be paramount in how Mr. Streb did not get a fair trial. There were some definitive issues here. As I told you, the defense was based upon the fact that the credibility of these young ladies had to be attacked. One of the issues that came up was with regard to the 412 inquiry. Now, we all know that a 412 inquiry, you have to give notice if you're going to use it. There was one ad, I believe it was MVB. And if you notice at the sentencing, the judge, district court judge, indicated that MVB's conduct was almost consistent with that of Mr. Streb. And she acknowledged that during the sentencing hearing. However, the 412 that she invoked is quite troublesome. Because, she says, the 412 rule was invoked, she said we should have had notice. I disagree vigorously with that. Because it was an ad where the young girl had put into an Internet ad and possibly a local newspaper ad that she was 19 years old. Part of Mr. Streb's defense is that he wasn't aware that these girls were under the age of 18. Because of how they dress, how they look, their makeup, etc. So, when you look at the 412 restriction, and this is what the district court said, we're going to restrict that evidence from coming in. The government had already introduced the ad. We were introducing the ad where she represented herself to be 19, which goes to the issue of recklessness in his view of the young ladies once he ran into that. What do you do with the 1591C, where you have a reasonable opportunity to observe the person so recruited? Doesn't that kind of weaken your argument a little bit? I would say, Judge Strass, it doesn't weaken it, but it does give us an opportunity to show the jury. Not like in the prostitution case or the oral sex case where it occurred before. This is not talking about her sexual conduct. This is talking about whether or not she represented herself to be 19. Now, clearly the jury could look at him again when the young lady testifies that she saw him for 15 minutes or 20 minutes. And you could talk about the lighting and all of this type of thing. But the important thing, it was one of the structures of his defense that they had represented themselves to be 19. The question for us is, does that create a question within a juror's mind coupled with these other two issues? Let me understand. Your argument really is that, yeah, he might have had a chance to observe her, but that was for the jury to decide. And so we had an opportunity to prove if he didn't observe her, the jury thought that, then recklessness could still apply and we should have been able to give the evidence. Recklessness, that is my exact argument. And it would have created an issue for the jury and it would have created an argument for us, but the judge completely restricted us from doing that. The other thing they restricted on MVB, and this ties in a little bit to the ultimate argument I'm going to make on what happened with that late disclosure. But the investigating officer acknowledged that he'd met with MVB when she was in juvenile detention approximately 13 times. And in those 13 meetings, he made certain deals. One of the deals he made with her was that he was going to drop the charge that she was being held on with regard to detention. Now, what the government did, the government gave that information under seal to the district court judge. So when the young lady testified, we asked a simple question. Mr. Strep asked a simple question. What charge was pending that led to the reason it was dismissed? The government had already introduced the evidence that it was dismissed. Now, the judge said, you cannot bring up the fact that what the underlining charge was. The question with that is that the government had opened the door. And I believe in the Eagle case, which we cite in that brief, you talk about to rebut evidence that is properly presented. We should have an opportunity, even if it's hearsay or other matters, to rebut the fact of what took place here. And in that instance, it was clear that the government had dismissed it as part of a deal to get MVB to come into court and testify. So it was a proper cross-examination question to ask MVB what the charge was. But again, the judge restricted that and said, you can't ask that question. Now, I know the government in its brief talks about, well, juvenile records are not normally admissible. But part of the reason she ended up in court in the first place where she said she didn't want to be is because of the deal that they made with her. Wasn't that – I mean, arguably, isn't it harmless, though? You got in the fact that you had the juvenile delinquency petition. The specific nature of the charge, how much did that really add to the overall case for the defendant? That's a great question. And you really can't tell that. But was it fair game? Yes. One, the government brought it up, so it was fair game. Was it proper cross-examination based upon Eighth Circuit precedent? Yes, it was fair game. Should the judge have restricted us from bringing that up? No, she should not have. And because we had argued that the government had brought it up in the first place, so there was no reason to restrict Mr. Shreve from being able to probe that issue. But wouldn't your argument be a lot stronger if the juvenile delinquency petition had ended up in a, you know, potentially in a conviction or an adjudication or something like that? It just seems like it's inherently weak to say she had this petition that was dismissed, and I want to tell you what the petition was about. We want to know the underlying grounds. Suppose it had been first-degree murder. We don't know. What if it had been a sex abuse where she had falsely accused someone of having sex with her? Then it becomes a probe into Rule 412 because a false allegation, you can open up that territory. I want to now turn to the issue, as some people might say as the medias here, that I'm sure you're all waiting to hear what happened, and you know what happened from the brief. Forty-eight hours before this trial started, the government sent a letter to Shreve's counsel advising that they had been paying money to the victims. Now, jump ahead a little bit. The judge said this was close to prosecutorial misconduct. She said close to it. But what was the letter, and what was the background of the letter? At one point during the course of the presentation while the jury is out there, the judge told them they had to disclose it, the information, and wanted to know why they did not disclose it. Two things here. The main argument we're making is that we should have had an evidentiary hearing. If you notice, throughout the inquiry, the court never let Shreve's counsel ask a question about the delay. Why didn't we get a full disclosure before we start picking the jury as to who was giving these victims money? The prosecutor gave the victim money. Find a case that allows that to happen and no inquiry made. The prosecutor at one point reached in their pocket, and we don't know to this day whether or not they used their own money or the government money. The lead investigator gave the victims money at various times, fuel money, coal money, school money, and it was not disclosed until 20. The answer might be, why didn't you take the continuance? The continuance would not have benefited us at all at that point, under any of the rules having to do with the rules of evidence. A continuance would not have benefited Mr. Shreve one iota. This is the question. When this happened and the judge clearly expressed her displeasure with the prosecutor's office, what did the prosecutors do? And this is a telling factor about what went on during this case. The U.S. attorney told the trial lawyer in the case, write a generic letter to the defense lawyer, a generic letter that does not disclose the information. And if you track the flow of the issue here, never did you get to the bottom of when the money was paid, the receipts that were paid, or any other aspect of this case. And you never got the evidentiary hearing that allowed the defense to proper prepare for cross-examination. Counsel, I want to ask you, so this seems to me to be very bad practice, unfair. Continue with the descriptions. But what I was looking for was an actual violation. So it's not a violation of Brady because you can do it until the end of trial. Or as long as it's done so you can use it at trial, it's good enough. Then you look at the district court's discovery order and it mentions Brady but not Giglio. Correct. And so there's no, this would be probably properly characterized as Giglio evidence. So I'm trying to, there is some unfairness in it, but I wonder if the remedy was okay given that I'm not sure if there is a technical violation of anything. And I want to give you a chance to respond to that. It was clearly what could be considered an ethical violation. It was further than a tactical violation because we were entitled to an evidentiary hearing to probe who pulled the money out. When did they pay them? What did the young girls say when they were paid? They're claiming they were vulnerable young ladies. Well, how do we know at this point that they weren't influenced by those payments for food, for fuel, for all of these things that you've acknowledged that they've done? It's more than bad practice. It denied Mr. Streb of a fair trial. The problem is the same thing the district court judge had. What's the remedy? That's, I mean, and do you have to argue that you were prejudiced because you were denied a continuance? The prejudice is the denial of the evidentiary hearing to establish that. This is more than bad practice. Why not cross-examine, and I think I know the answer, but why not cross-examine the witnesses? Did you receive a $100 gift card from the prosecution, et cetera? She allowed what she called liberal cross-examination, but you can see early on in the process that the district court judge cracked down on the liberal examination. And if you track it, there was no liberal cross-examination because when I asked the investigator, well, you said you paid for a meal at this Italian restaurant. Where's the receipt? And the judge shut us down right away and said, no, you can't go there. There's one last issue on the case. You know, I hate to take away from your rebuttal, but I did have one question,  Nothing is unfair for me. But at some point it seemed to me that your objections could have been dealt with by just asking the judge for the opportunity to examine the witness outside the presence of the jury for the purposes of laying an objection, right, a foundation for an objection, which, of course, is kind of a trick because it really wouldn't have been why you were doing it. But if you'd have done that, you would have at least had a moment so you could have laid in what you needed, could have found out what you needed to know for the purposes of the cross. I would grant that might have been one of the options. But if you follow the trail of the cases of the out of the approaches to the bench, the out of the jury presence for questioning, those things took place. I thought we made a sufficient record, though, so this appellate court could take a good, close look at what happened to establish that this was not a very friendly venture. I mean, I have great respect for the judge, but obviously you have to defend your client under these circumstances. The only last thing I would mention, and I'll come back and rebuttal, on 613 where she made a new rule for impeachment, on the 613B you never have to lay out specifically what the question is before you can ask the witness did she answer the question. She created a new rule for impeachment. And these are all summaries we were working from. There were no audio or video recordings of these young ladies. So she created a new rule for impeachment and prevented us from impeaching these young ladies, which was the core of our defense. Thank you, Your Honors. Thank you. Good morning, Your Honors, and may it please the Court. This Court should affirm Mr. Streb's conviction and sentence. It was a result of a fair trial, perhaps not a perfect trial, but Mr. Streb received what he was constitutionally entitled to, and that is a fair trial. I'll start off today by talking with the last issue Mr. Parrish discussed, the lay disclosure of alleged benefits to these victims. As the District Court said, there was no discovery violation here, no violation of Brady. The information was provided before the start of trial. In fact, at transcript page 1179, the District Court informed the defendant he had received more information than he was entitled to. The District Court at that point then granted several discovery sanctions, and the question for this Court is whether those sanctions were an abuse of discretion. Obviously, the District Court has broad discretion in issuing discovery sanctions, so broad, in fact, that neither party refers to a case in which this Court has overturned a discovery sanction issued by a District Court, and it shouldn't do so here as well. First of all, I'll briefly address defense's request for an evidentiary hearing in regard to these lay disclosures. First of all, he cites no cases suggesting such an evidentiary hearing is required. He cites Franks v. Delaware in a case called United States v. Losing from this Court, neither of which are on point. Regardless, he received a hearing here. Before jury selection, the parties and the Court had a long discussion about the delayed disclosure, and then after jury selection, the Court held a two-hour hearing, most of which was directly related to these benefits, and from transcript pages 40 to 82 covers that entire discussion about these benefits. Sixteen pages of that, pages 60 to 76, was the Court questioning the two prosecutors, the victim witness specialists, and the case agent in this case about the benefits. From pages 17 pages, between 40 to 82, are Mr. Parrish himself arguing which remedies are appropriate to prejudice his client has suffered, and both before and after the District Court questioned the government actors here, he had an opportunity to state his point. Does it matter? I mean, I think that the judge can go ahead and make inquiry of all the officers of the Court without putting them under oath, and they have some legal obligations of candor to the Court that are the equivalent of being under oath. But, you know, we have questions here that were posed to officers who are not officers of the Court, but are just regular government agents, and they answered questions not under oath, and opposing counsel was not afforded the opportunity to ask questions, nor was, as far as I could tell when I looked at it, did opposing counsel have the opportunity to tell or ask the judge, will you please ask these questions, right? And so that doesn't really look a lot like a hearing to me. It looks sort of like just half-baked, right? Does that matter at all? Not on the facts of this case, Your Honor. In this case, you can tell when reading the transcript, the District Court judge was trying to capture the arguments Mr. Parrish made. At one point, the District Court said, I'm referring to this transaction because I think these transactions are the ones that he seems to be focused on. So even though Mr. Parrish maybe didn't give her a list of questions she should ask, she was attempting to do that. I get that. It sort of reminds me of that old line from the movie. It says, I don't mind if you try my case, Judge, just don't lose it for me. You know, I mean, that's kind of my concern here. I mean, I don't think it's quite the same if you deprive the lawyer, the advocate, of his or her voice in the process. I don't necessarily disagree, Your Honor. Again, I think on the facts of this case where the agent who was questioned by the court was the case agent was sitting beside the two prosecutors. He was later put under oath multiple times at trial. And I'll get more into this in a moment when I'm discussing the three factors this court considers, one of which is prejudice. And I'll just go ahead and turn there now. One of the reasons why this court shouldn't overturn the District Court's decision in regard to these discovery sanctions is because the defendant suffered no prejudice. One reason we know that is he spent a lot of time at trial eviscerating the credibility of the case agent and of the victims. And I'll start with the case agent, Detective Gonzalez. He was the person who was asked questions by the judge at that hearing. Mr. Parrish spent 20 pages of cross-examination, transcript pages 1152 to 1172, asking Detective Gonzalez specifically about the benefits he allegedly provided to these victims. Essentially, Mr. Parrish had free reign to ask whatever he wanted, which is what the District Court told him he could do. An example of that is in his initial cross-examination of Detective Gonzalez. It focused almost entirely on Minor Victim B. In redirect, the prosecutor asked four questions, all about Minor Victim B. Mr. Parrish then conducted recross, none of which, to my knowledge, was about Minor Victim B. Instead, it was focused primarily on Minor Victim A and went entirely beyond the scope of the redirect. And I believe the prosecutor even objected at one point. The court overruled that objection and allowed Mr. Parrish to ask whatever he wanted on recross. Not only that, however, Mr. Parrish also cross-examined Minor Victim A from pages 481 to 488 of the transcript and got her to admit that she received around $400 of benefits. What about opposing counsel says, but, you know, it seems that the district judge didn't allow liberal cross-examination. I wanted to ask about a receipt from dinner and the district judge immediately cut me off. What's your response to that? I'm not sure if he's correct in saying the district court judge immediately cut him off. In the context of that discussion, the district court did inform him that he received more than he was entitled to. In addition, the defense did not cross-examine Minor Victim B, Minor Victim E, or another detective involved in the alleged benefits. That detective could have, to my knowledge, did not produce a receipt about gas. But Mr. Parrish and the defense did not ask any questions of him. And so to the extent that that's in any way relevant, it did not prejudice the defense. Another reason being is that in closing, and I'll point the court specifically to transcript page 1387, 1403 to 1411 and 1414, the defense argued specifically Detective Gonzalez outright paid the victims and that there are no receipts of these benefits. He then went on to argue that the victims used drugs, received benefits, and that their stories got better and better and better. He made every point he possibly could have made about these girls' credibility being trashed. Counsel, what about the limitations that were placed on impeaching the witnesses with prior inconsistent statements? How is it not prejudicial that they were limited to previously asked questions when all they had was a summary? They didn't have a verbatim transcript of the previous interviews. Well, Your Honor, I believe at least in regard to some of the cross-examination occurred, they had more than just summaries. And two reasons I'll provide you for why the court's instructions there didn't prejudice the defense. First, I'll point out that the court's instructions about asking the exact question concerned only extrinsic evidence. So the defense was still able to cross-examine witnesses based on prior inconsistent statements. That instruction was just limited to the use of extrinsic evidence. And that's at page 500 to 501 and 503 to 505. In addition, Mr. Parrish and the defense said that... In your experience, is that a somewhat constrained view of Rule 613? I think it is, Your Honor. However, underlying all of this is the district court's concern about the defendant's cross-examination of these victims. And I'll point you now to her order on a new trial, which is Docket 467, and specifically pages 48 to 49. She says, She added at another point, at transcript 1082, that the defendant has repeatedly shifted what you had previously said your position was on serious issues. The district court here was acting within her discretion, attempting to prevent inadmissible evidence from coming into trial and being presented to the jury. Turning back to your question, Judge Gross, the defendant was not prejudiced in any way by the district court's instruction to that effect. And I'll give you two examples. First of all, the rule that she said about asking the exact question, it was rarely enforced as an initial matter. And I'll direct you to an example at transcript page 857 to 858, which is where Mr. Parrish was questioning minor victim E and jumped immediately into the question, when you gave your statement, you told law enforcement you only met Mr. Streb two times. Is that right? So he never asked the exact question. He went straight to the point, what did you say to them? Well, I mean, it could also have a chilling effect on what questions were asked. So it's hard to say that it wasn't enforced. Well, and another, the second point I'll make is when the rule was enforced, the defense complied with the rule. And so to the extent it had a chilling effect, they did try to comply with it and did successfully comply with it. And I'll point you for that proposition to transcript page 899 to 901. Mr. Parrish's co-counsel was questioning minor victim B. The court instructed her to use the exact question and answer. And then his co-counsel said, you're saying today every time you met up with him you had sex, but you were asked that at grand jury, right? And you said sometimes you would just talk. And then she continued to discuss the grand jury testimony, pointing specifically to certain page numbers in the testimony, in the grand jury testimony to make her point and to follow the court's instructions. And so there was no prejudice here as a result of the district court attempting to do, to control the presentation of evidence in the courtroom. In the same vein, there was no abuse of discretion here in the district court excluding ads of minor victim B. The defendant himself at docket 277 at page 2 agreed that information concerning sex acts by minor victim B with other individuals was irrelevant and should not be admissible. As Mr. Parrish pointed out a moment ago, they did not meet the disclosure requirements of Rule 412. That's at transcript 93 and 94. And now in his brief, the defendant is claiming that these ads were relevant to whether the defendant knew the victim's ages or reasonably had an opportunity to observe them or recklessly disregarded their age. But as the district court said, the ads were irrelevant because there was no evidence that the defendant saw the ads, was affected by the ads in any way, or contacted the phone numbers that were listed on the ads.  It was a 412 ruling. It was a 403 ruling. Both. And that under 403, the judge said that any probative value was outweighed by the likelihood of unfair prejudice. But you think the ruling kind of goes beyond the text of 412? It doesn't in the sense that the judge was concerned about the presentation of the entire ads showing that the victims, or minor victim B in this case, was engaged in other forms of sexual behavior. Now, to the extent Mr. Parrish and the defense is now arguing that what they really wanted to present was just this one little sliver of evidence and use it for only one little purpose, which was to show that Mr. Streb could have believed these girls were older than 18. In response to that, I think the district court is correct. It's irrelevant for that purpose because there's no evidence the defendant saw the ads. On top of that, at transcript 896 to 898, minor victim B said she didn't even post the ads. So I don't know how we could have, I don't know how the defense could have gotten the ads into evidence. To my knowledge, there was no witness called for the trial who could actually authenticate the advertisements. Part of the reason for that is that two of the ads were posted by a co-defendant and had the co-defendant's phone number on the ad. And as the defense said at docket 271, which is his motions and lemonade, I believe, page 10 to 12, he said that acts done by other co-defendants should not be admitted into trial. On top of all of that, the evidence, the ads would have had no impact even if they had been admitted. And this is apparent from transcript page 871 to 874. Minor victim B admitted that she met the defendant on an ad site and she admitted that she told the defendant she was 18 to 19 years old. And so to the extent these ads would have been introduced, they would have been simply cumulative of what minor victim B had already said. Similarly, there was no abuse of discretion here by the district court excluding minor victim B's dismissed detention petition. At docket 277, page 4 to 5, before trial, the defendant agreed that this detention petition, the charges in it, were inadmissible because they don't involve acts of dishonesty or prior convictions that are admissible under Rule 609. Now he claims that he was prejudiced. He should have been able to explore the exact nature of the charges, but the government never opened the door on the exact nature of the charges. Both parties asked only about whether minor victim B was in detention at some point. I believe the very first cross-examination question asked minor victim B, transcript 890 to 891, and I'll also point you to page 904, very first question, if you didn't testify, you'd go back to detention. And I believe the answer was yes. And then a follow-up was how long were you in detention? Three months. In closing, at transcript 1394 and again at 1406, the defense again brought up the fact that minor victim B would have to go back to detention if she did not testify. She said explicitly on the record, I don't want to be here. The only thing the defense could not offer was the exact charges that minor victim B was facing, and he couldn't offer the petition into evidence. Otherwise, he got everything he wanted and was able to undermine the victim's With the rest of my time, I'll discuss the sufficiency of the evidence argument. I heard a wise attorney once say that a sufficiency of the evidence argument is a last grasp of a desperate appellant. I'll reiterate that now. The defendant doesn't challenge the convictions for distribution of controlled substances. He doesn't challenge the possession with intent to distribute count. He challenges only whether the gun possession was in furtherance of his drug trafficking. Of course, viewing all facts, resolving all conflicts, and drawing all reasonable inferences in the favor of the verdict, this Court should affirm the sufficiency of the evidence for the 924C count. Is the strongest argument really just the proximity? I don't think so, Your Honor. I think that's a very good argument, and I'll return to that after I address what I think is our strongest argument for you. Our strongest argument, I believe, is that there's evidence suggesting that Mr. Streb actually carried these weapons. I'll point you, and I'll list a few of these transcript pages now, 635, 645-46, and 650-651. The guns here were surrounded by multiple holsters. One of the guns was in a holster, suggesting that Mr. Streb did, in fact, carry the guns. In his truck, Mr. Streb had a spare box of ammunition with rounds missing, and also methamphetamine paraphernalia. Couldn't he have just been going the shooting range? That's possible, Your Honor, but I think here, based on all of the evidence, there's a reasonable inference that the jury made and that this Court should affirm based on that he was using these with that, because I think just merely carrying them, even with the holsters, doesn't tell you what he was carrying them for. I would hate to say that just because you have guns and you have holsters and you sell drugs, that somehow those things are connected, just by almost like a race-ifs-a-loquitur type of argument. I think, setting aside whether your concern is well-placed or misplaced, I think here the evidence presented sets that concern to the side, and I think the evidence... Guns and holsters in North Dakota, they're ubiquitous, right? I'm just telling you that in my house they exist, right? I'm trying to see, other than proximity, how you're tying it to any drug-dealing activity at all. It doesn't seem to me that anybody said, I saw Streb with a gun when we did this. I don't see it, like the box of shells wasn't sitting next to a pound and a half of meth or something, right? I think what connects the gun possession here to the drug-dealing is the expert testimony, and that's at pages, I'll point you specifically to transcript 153 to 158, where the expert testified, individuals in drug trafficking typically use firearms. They use firearms to protect their profits, their proceeds, and themselves. Usually the gun is nearby in a residence or in an automobile, and that's the exact situation we have here, and the facts here are consistent... But usually we find pay-oh sheets, we find larger quantities, we find... This is kind of a weird case, and where the guns are found is really where a person who is not dealing drugs might just keep a gun for personal protection and a holster. Well, I think going back to the proximity point that Judge Gross mentioned, I think that's important to note here as well, and this is a transcript, 1238 to 1239. The defendant's own witness said the closet where these guns were located was a mere 31 inches from Mr. Streb's side of the bed. The nightstand where there were mirrors and empty baggies, and baggies with methamphetamine residue on them, and a digital scale, and Mr. Streb told some of the... I believe at least one victim, he had to go home to weigh his methamphetamine. And so it was clear that his home was the centerpiece of his distribution efforts, and that those guns were in extreme proximity to those efforts, and for that reason, and because of the expert testimony and the consistency with this Court's past cases, this Court should affirm that conviction, all of the convictions in Mr. Streb's sentence. Thank you. Thank you, Your Honor. In the transcript at 871, page 2324, the government introduced the off-site ad. We were merely producing the evidence to show that they represent themselves to be 19 years of age. It was a 412 ruling. I don't recall, nor I don't think the government argued that it was a 403. The chilling impact of this was significant, but 613B is even more troublesome. I know you brought that up, Judge Gantz. The impact there, the judge confused a couple of rules, I think. She confused the extrinsic evidence with extrinsic impeachment. That's a little bit different, and it did create a chilling impact, and I think the government agreed that we tried to comply, and my co-counsel also tried to comply. But the chilling impact of enforcing a rule of evidence that doesn't exist is troublesome in a very difficult and complex case, where your whole goal is to try to impeach these witnesses and show they were using drugs, their memories were flawed. How else do you present a competent defense under these circumstances? We believe that 613B and all the rest of the trial errors were substantial, and we believe this case ought to be reversed where Mr. Streb can get a fair trial. Thank you, Your Honors. The matter has been fully briefed and well-argued. I want to thank you for your time here today. We'll take the matter under advisement, and you'll hear from us in short order.